## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
## NORTHERN DIVISION

**JACK J. NELSON**
19909 Mikes Way
Parkton, Maryland 21120

**Individually and on Behalf of All Others
Similarly Situated,**

      **Plaintiff**

    **v.**

**COVENTRY HEALTH CARE, INC.**
7605 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**DALE B. WOLF**
7605 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**DANIEL N. MENDELSON**
7605 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**RODMAN W. MOORHEAD, III**
7605 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**TIMOTHY T. WEGLICKI**
7605 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**L. DALE CRANDALL**
7605 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**ELIZABETH E. TALLETT**
7605 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**ALLEN F. WISE**
7605 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**JOEL ACKERMAN**
7605 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**Civil Action No.:** _____

**CLASS ACTION COMPLAINT
FOR VIOLATIONS OF ERISA**

#1185003v.1

**LAWRENCE N. KUGELMAN**
7605 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**SHAWN M. GUERTIN**
7605 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**PATRISHA DAVIS**
7605 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**COVENTRY 401(k) PLAN
   INVESTMENT COMMITTEE**
7605 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**JOHN DOES 1-10**
7605 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**Defendants**

## CLASS ACTION COMPLAINT

Plaintiff Jack J. Nelson ("Plaintiff"), individually and on behalf of the Coventry Health Care, Inc. Retirement Savings Plan (the "Plan"), as well as all other similarly situated Plan participants, alleges the following based upon the investigation by Plaintiff's counsel, which included, *inter alia*, a review of public documents filed by Coventry Health Care, Inc. ("Coventry" or the "Company") with the United States Securities and Exchange Commission ("SEC") and the United States Department of Labor ("DOL"), conference calls and announcements made by Defendants, securities analysts' reports, wire and press releases published by and regarding the Company, and other publicly available information.

## INTRODUCTION

1.      This is a class action brought pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (a)(3), on behalf of the Plan, against the Plan's fiduciaries, including Coventry.

2

2.      Plaintiff alleges that Defendants, as fiduciaries of the Plan, breached their duties to the Plan and the Plan's participants and beneficiaries in violation of ERISA, particularly with regard to the Plan's holdings of Coventry common stock, which Defendants knew or should have known was an imprudent investment alternative for the Plan.

3.      This action seeks relief on behalf of the Plan, for losses to the Plan, for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3)), Plaintiff seeks other relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

4.      Because Plaintiff's claims apply to the participants and beneficiaries of the Plan as a whole, and because ERISA authorizes participants such as Plaintiff to sue for breaches of fiduciary duty on behalf of the Plan, Plaintiff brings this as a class action on behalf of all participants and beneficiaries of the Plan during the period of February 9, 2007 through the present (the "Class Period").

## JURISDICTION AND VENUE

5.      **Subject Matter Jurisdiction.**  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

6.      **Personal Jurisdiction.**  ERISA provides for nation-wide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  As all Defendants are either residents of the United States or subject to service in the United States, this Court has personal jurisdiction over them.

7.      **Venue.**  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, the Company is headquartered in

3

this District, and some or all of the fiduciary breaches for which relief is sought occurred in this District.

**PARTIES**

### A.    Plaintiff

8.    Plaintiff is a resident of Baltimore County, Maryland.  Plaintiff was and continues to be a Plan participant, within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1132(a).  During the Class Period, Coventry stock was purchased or maintained on Plaintiff's behalf by means of the Plan in the Company Common Stock Fund.

### B.    Defendants

9.    **Defendant Coventry** is a Delaware corporation, with its principal executive offices located at 6705 Rockledge Drive, Suite 900, Bethesda, Maryland 20817.  Coventry, a national managed health care company, operates health plans, insurance companies, network rental/managed service companies, and workers' compensation companies. During the Class Period, Coventry common stock traded on the New York Stock Exchange.

10.    Upon information and belief, Coventry, at all times, acted through its officers, directors and employees, including, but not limited to, members of the Company's 401(k) Plan Investment Committee (the "Investment Committee"), who were appointed to perform Plan-related fiduciary functions, and did so in the course and scope of their services for the Company.

11.    During the Class Period, Coventry was a Plan fiduciary in that it had, upon information and belief, at all applicable times, effective control over the activities of its officers, directors and employees, including their Plan-related activities.  Through its Board of Directors (the "Board"), or otherwise, Coventry had the authority and discretion to hire and terminate said officers and employees.  Coventry also had the authority and discretion to appoint, monitor and

4

remove officers, directors and employees that performed fiduciary functions with respect to the Plan, including members of the Investment Committee. The actions of the Company's officers, directors, and other employee fiduciaries are imputed to Coventry under the doctrine of *respondeat superior*, and Coventry is liable for these actions.

### *The Director Defendants*

12.   **Defendant Dale B. Wolf** ("Wolf") served, at all relevant times, as Coventry's Chief Executive Officer ("CEO") and Director. During the Class Period, Defendant Wolf was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and exercised authority or control with respect to the management of the Plan's assets.

13.   **Defendant Daniel N. Mendelson** ("Mendelson") served, at all relevant times, as the Director of the Company. During the Class Period, Defendant Mendelson was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and exercised authority or control with respect to the management of the Plan's assets.

14.   **Defendant Rodman W. Moorhead, III** ("Moorhead") served, at all relevant times, as the Director of the Company. During the Class Period, Defendant Moorhead was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to

the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and exercised authority or control with respect to the management of the Plan's assets.

15.    **Defendant Timothy R. Weglicki** ("Weglicki") served, at all relevant times, as the Director of the Company.  During the Class Period, Defendant Weglicki was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and exercised authority or control with respect to the management of the Plan's assets.

16.    **Defendant L. Dale Crandall** ("Crandall") served, at all relevant times, as the Director of the Company.  During the Class Period, Defendant Crandall was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and exercised authority or control with respect to the management of the Plan's assets.

17.    **Defendant Elizabeth E. Tallett** ("Tallett") served, at all relevant times, as the Director of the Company.  During the Class Period, Defendant Tallett was a fiduciary within the meaning of ERISA, because she exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, she possessed discretionary authority or discretionary responsibility in the administration of the Plan, and exercised authority or control with respect to the management of the Plan's assets.

18.     **Defendant Allen F. Wise** ("Wise") served, at all relevant times, as the Director of the Company.  During the Class Period, Defendant Wise was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and exercised authority or control with respect to the management of the Plan's assets.

19.     **Defendant Joel Ackerman** ("Ackerman") served, at all relevant times, as the Director of the Company.  During the Class Period, Defendant Ackerman was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and exercised authority or control with respect to the management of the Plan's assets.

20.     **Defendant Lawrence N. Kugelman** ("Kugelman") served, at all relevant times, as the Director of the Company.  During the Class Period, Defendant Kugelman was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and exercised authority or control with respect to the management of the Plan's assets.

21.     Defendants Wolf, Mendelson, Moorhead, Weglicki, Crandall, Tallett, Wise, Ackerman and Kugelman are herein referred to as the "Director Defendants."

22.     The Director Defendants, among their other Plan-related duties and responsibilities, are charged with appointing members of the Investment Committee.  *See*

Coventry Form 11-K, dated June 29, 2009, for the fiscal plan year ended December 31, 2008 (the "2008 Form 11-K") at 5.

### *The Investment Committee Defendants*

23.    **Defendant Investment Committee**, at all relevant times, managed and administered the Plan and the Plan assets and acted as a fiduciary with respect to the Plan.

24.    At all relevant times, the Investment Committee was, upon information and belief, comprised of employees, officers, or directors of Coventry, who were charged with designating investment funds for the Plan, establishing rules and procedures with respect to the Plan's investment funds and monitoring the performance of the Plan's investments. During the Class Period, the members of the Investment Committee were appointed by the Coventry Board. The Investment Committee and its members were fiduciaries of the Plan within the meaning of ERISA in that they exercised discretionary authority and discretionary control with respect to the Plan's management, administration, investments, and assets.

### *The Plan Administrator Defendants*

25.    **Defendant Shawn M. Guertin** ("Guertin"), at all relevant times, has served as the Plan Administrator. Defendant Guertin also serves as Coventry's Executive Vice President, Chief Financial Officer, ("CFO") and Treasurer. During the Class Period, Defendant Guertin signed relevant Plan filings with the SEC, and was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and exercised authority or control with respect to the management of the Plan's assets.

#1185003v.1

26.     **Defendant Patrisha Davis** ("Davis"), at all relevant times, has served as the Plan Administrator.  During the Class Period, Defendant Davis signed relevant Plan filings with the SEC, and was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, she possessed discretionary authority or discretionary responsibility in the administration of the Plan, and exercised authority or control with respect to the management of the Plan's assets.

### *John Doe Defendants*

27.     **Defendants John Does 1-10** are additional Coventry's officers, directors, employees, members of the Investment Committee and/or any other committees, who were fiduciaries of the Plan during the Class Period, and whose identities are presently unknown to Plaintiff.  Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

### THE PLAN

**A.     Nature of the Plan**

28.     The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) and defined contribution plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

29.     The Plan is a legal entity that can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is neither plaintiff nor defendant.  Rather, pursuant to ERISA § 409, 29 U.S.C. §1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan.  Stated differently, in this action Plaintiff seeks relief that is plan-wide.

30.     The Plan covers eligible employees of Coventry and its subsidiaries.

31.     According to the Company's 2008 Form 11-K at 5, Plan participants may generally contribute an amount up to 75% of their compensation on a pretax basis to the Plan. Additionally, Coventry matches 100% of each participant's contribution up to a maximum 3% of compensation, and 50% of each participant's contribution in excess of 3% up to a maximum 6% of compensation considered, for a maximum matching contribution of 4.5% of eligible Plan compensation. *Id.* Coventry's matching contributions are made in shares of the Company's common stock. *Id.*

32.     Under the terms of the Plan, Coventry's Common Stock Fund is the principal common stock investment option under the Plan. According to the 2008 Form 11-K at 8, the Plan held $49,895,466 worth of Coventry common stock for the 2008 Plan year.

33.     Upon information and belief, the Summary Plan Description ("SPD") for the Plan incorporates by reference, certain information filed with the SEC, including but not limited to, Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Periodic Reports on Form 8-K and Registration Statements, rendering communications contained in such filings with the SEC fiduciary communications with Plan participants and beneficiaries.

**B.     Defendants' Fiduciary Status**

34.     *Named Fiduciaries.* ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

#1185003v.1

35.     *De Facto Fiduciaries*.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions.   Thus, a person is a fiduciary to the extent he or she "(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

36.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan, and its investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

37.     Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

38.     ERISA permits the fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries must still in fact act solely in the interest of participants and beneficiaries, not in the interest of the sponsor.  Moreover, all Plan fiduciaries were obliged, when

#1185003v.1

wearing their fiduciary hat(s) to act independently of Coventry with respect to the Plan, the Plan's investments, or the disclosure of information between and among fiduciaries or from fiduciaries to the Plan's participants.

### C.    Defendants' Fiduciary Roles

39.    During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plan and/or management or disposition of the Plan's assets.  Furthermore, during the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

### *Coventry*

40.    Upon information and belief, under the terms of the Plan, Coventry, through its Board as well as its officers and employees, including members of the Investment Committee, had direct control and management over all aspects of the operation, or administration of the Plan that was not specifically delegated to the named fiduciaries under the Plan and upon information and belief, exercised this control.

41.    As a matter of corporate law, Coventry is imputed with the knowledge that its officers and employees had of the misconduct alleged herein, even if not communicated to Coventry.

42.    Upon information and belief, Coventry exercised responsibility for communicating with participants regarding the Plan, and providing participants with information and materials required by ERISA.  In this regard, Coventry drafted and disseminated various documents and materials related to the Plan, including but not limited to, an SPD and the documents incorporated into the SPD.  Based on the allegations contained herein, Coventry is a

fiduciary with respect to the Plan because it exercised discretionary authority or discretionary responsibility in the administration of the Plan, exercised discretionary authority or control with respect to the management of the Plan's assets, and exercised discretionary authority and control with respect to the appointment of other Plan fiduciaries.

### *The Director Defendants*

43.     The Director Defendants are the Plan's fiduciaries to the extent they exercised their authority to select, monitor, retain, and remove Plan fiduciaries, including members of the Investment Committee and, accordingly, exercised authority and oversight over the such fiduciaries, including members of the Investment Committee, who reported to the Board regarding the Investment Committee's fiduciary duties and responsibilities to the Plan and with respect to their actions pertaining to the same.

### *The Investment Committee Defendants*

44.     Upon information and belief, Defendant Investment Committee is responsible for directing and coordinating all activity relating to the investment management of the assets of the Plan.  In discharging the foregoing duties, the Investment Committee, upon information and belief, has the authority and discretion to add investment options or eliminate investment options.

45.     In their capacity to select and monitor investment options for the Plan, the Investment Committee had the discretion and authority to suspend, eliminate, or reduce any Plan investment, including investments in the Coventry stock.   Upon information and belief, the Investment Committee regularly exercised its authority to suspend, eliminate, reduce, or restructure the Plan's investments. The Investment Committee also reported to the Board regarding these duties and the Plan's events pertaining to the same.

#1185003v.1

46.     Further, upon information and belief, the Investment Committee exercised responsibility for communicating with participants regarding the Plan, and providing participants with information and materials required by ERISA.  In this regard, on behalf of Coventry and the Director Defendants, the Investment Committee disseminated the Plan's documents and materials.

47.     As such, the Investment Committee was a fiduciary of the Plan during the Class Period, in that it exercised discretionary authority with respect to the management of the Plan and/or management and disposition of the Plan's assets

### *The Plan Administrator Defendants*

Upon information and belief, during the Class Period, Defendants Guertin and Davis, the Plan Administrators, were charged with and exercised their administrative responsibilities pertaining to the Plan.  Upon information and belief, the Investment Committee may delegate to the Plan Administrator(s) the responsibility of administering and operating the details of the Plan in accordance with the provisions of the Plan and any policies that may from time to time be established by the Investment Committee.  The Plan Administrator(s) has full discretionary authority to determine all questions and to make all factual determinations regarding any and all matters arising in the administration, interpretation and application of the Plan. During the Class Period, the Plan Administrator Defendants were fiduciaries of the Plan, in that they exercised discretionary authority with respect to the management of the Plan and/or management and disposition of the Plan's assets.

## CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time during the Class Period, *i.e.*, between February 9, 2007 and the present, and whose accounts included investments in Coventry stock.

49.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class who participated in or were beneficiaries of the Plan during the Class Period.

50.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants each owed a fiduciary duty to Plaintiff and other Class members;

(b)     whether Defendants breached their fiduciary duties to Plaintiff and other Class members by failing to act prudently and solely in the interests of Plan participants and beneficiaries;

(c)     whether Defendants violated ERISA; and

(d)     whether the Class members have sustained damages and, if so, the proper measure of those damages.

51.     Plaintiff's claims are typical of the claims of the other Class members because Plaintiff and the other Class members each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

52.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

53.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

54.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

### A.     Background

55.     Defendant Coventry operates as a managed healthcare company through health plans, insurance companies, network rental and workers' compensation services companies. The

#1185003v.1

Company offers risk and fee-based managed care products and services to a broad cross section of individuals, employer and government-funded groups, government agencies, and other insurance carriers and administrators through its Commercial Business, Individual Consumer & Government Business, and Specialty Business divisions via a direct sales staff and a network of independent brokers.

56.     Coventry's Commercial Business division product line includes: (i) its health maintenance organization ("HMO"); (ii) preferred provider organizations ("PPO"); and (iii) point of service products.   This division also offers commercial management services products and consumer-directed benefit options, including health reimbursement accounts and health savings accounts.

57.     The Company's Individual Consumer and Government division offers health benefits to members participating in the Medicare Advantage HMO, Medicare Advantage PPO, Medicare Advantage Private-Fee-For-Service, Medicare Prescription Drug, and Medicaid programs. This division also provides fully-insured managed care services, as well as other products and services, such as pharmacy benefit management, clinical management, and fiscal intermediary services.

58.     Coventry's Specialty Business division offers various products, including access to provider network, pharmacy benefits management, field case management, telephonic case management, independent medical exam, and bill review capabilities; and network rental services and other managed care products through a PPO network to national, regional, and local third party administrators and insurance carriers.   This division also includes mental-behavioral health benefits business and dental benefits business.

59.     On December 6, 2006, prior to the start of the Class Period, at the Company's Investor Day with securities analysts and investors (which included Plan Participants), the Company's executive management explained that while the Commercial Business division had been the cornerstone of its business, going forward, much of its growth would emanate from its Individual Consumer and Government division.   Fran Soistman, the Company's Executive Vice President, announced that the Company had recently launched its Medicare Private-Fee-For-Service ("PFFS") initiative:

> Medicare Part D was the first time that Coventry embarked on a national Medicare initiative. And the success that we have realized thus far with Medicare Part D was the model that we replicated for Private-Fee-for-Service, which we launched three weeks ago.
>
> I would depict the Medicare business growth engine as one that has the capacity. It has the horsepower. It has a track record, both with the Medicare Advantage business of delivering consistent performance, both top line and bottom line. But, the Medicare Part D was, perhaps, the first time we really opened it up and showed you what we could do on a much larger scale. And obviously, we look to replicate that with Medicare Private-Fee-for-Service.
>
> Let's move on to the Private-Fee-for-Service product, our new product, again branded as Advantra Freedom. Well, let's start with taking success on the Part D side and replicating that on the Private-Fee-for-Service side. We learned a lot, we did a lot of things right on Part D and we're replicated that for Private-Fee-for-Service starting with dedicated leadership and bringing the entire organization together. It's what you've come to expect from Coventry, the IT folks, they respond, they get the job done. Customer service organization, they respond, they get the job done. It's all that happens behind the scenes that you never really hear about, but trust me, none of this is possible if it didn't happen. So that's in place, we're very pleased with our readiness for private fee.

60.     The Company's Form 10-K for the year ended December 31, 2006, contained the following description of the product:

> Commencing January 1, 2007, the Company will offer Medicare Advantage Private Fee for Service ("PFFS") plans in 43 states under the name Advantra Freedom. These plans are offered under a contract with [The Centers for Medicare & Medicaid Services] and provide enrollees with all benefits they receive under Original Medicare plus additional benefits such as preventive care and

18

eyeglasses/hearing aid coverage and pharmacy benefits. Enrollees are not limited to network providers, but may utilize any provider willing to accept the plan's terms and conditions. Providers generally receive the same reimbursement as under original Medicare. The Company's products will be underwritten by its health insurance subsidiaries.

61.     Accordingly, at the start of the Class Period, the Company's future growth prospects were highly dependent on its new Medicare PFFS initiative.  In early 2007, securities analysts noted that the key theme for the Company's outlook was its push into the Medicare PFFS market as the membership and growth of its Commercial business had stalled. In fact, in a February 2007 research report, JP Morgan Securities referred to Coventry's Commercial business as it *"Achilles heel."*

62.     During the Class Period, Defendants issued numerous inaccurate statements which failed to disclose that the Company engaged in an undisclosed under-pricing practice to obtain new Medicare PFFS members.   Throughout the Class Period, Defendants created the appearance that the Company's new Medicare PFFS initiative was capable of the high growth necessary to offset the Company's contracting Commercial business.

63.     Defendants knew or recklessly failed to disclose the true risks associated with Coventry's Medicare PFFS under-pricing strategies, including the fact that while the Company's Medicare PFFS products were rapidly gaining market share, such gains were having a material adverse effect on the Company's profit margins and profitability.   The true negative effects of such practice on the Company's profitability and profits margins were masked by improper claims assumptions that understated the Company's health care claim costs.

64.     The Company's under-pricing strategies and other deceptive practices did not reflect its true "medical loss ratio" ("MLR").  The MLR, or the ratio of expenses of providing healthcare services expressed as a percentage of insurance premiums, is a significant and closely

watched financial indicator of healthcare companies. Generally, a low medical loss ratio is rewarded on Wall Street by higher stock prices since it indicates that a lower fraction of revenues are spent paying health care claims, translating into greater profits.

65. During the Class Period, Defendants issued inaccurate statements about the Company's business, while failing to disclose adverse longer term trends. Defendants were also issuing positive inaccurate statements about the Company as insiders collectively sold more than 800,000 Coventry stock in excess of $46 million.

**B.    Facts Pertaining To Defendants' Breaches of Fiduciary Duties**

66. On February 9, 2007, the Company issued a press release and announced its financial results for the fourth quarter and year ended December 31, 2007. The Company also announced that was increasing its 2007 Medicare PFFS membership growth expectations by 65% to 90,000-100,000 members.

67. On that same day, the Company held a conference call for investors (which included Plan Participants) and securities analysts. Defendants discussed the Company's Medicare PFFS initiative:

> **Defendant Wolf:**
>
> On Private Fee-For-Service, our team has built a terrific new business for us. We will likely wrap up January with something just over 70,000 new members. We expect to exceed 85,000 new members by the end of the first quarter and somewhere between 90,000 and 100,000 members by year-end.

> **Defendant Guertin:**
>
> Cash flow from operations is outstanding, and health plan reserves are stable. Our most significant growth initiative of 2006, Medicare Part D, has produced outstanding results, both top line and bottom line, and our newest growth initiative, Medicare Private Fee-For-Service, is off to a roaring start.

#1185003v.1

\*       \*       \*

*In addition, as you heard Dale describe, we are exceeding our expectations on Medicare Private Fee-For-Service, both in terms of the total membership and how quickly it is coming on board.* During the quarter, we spent a little over $7 million in support of the Medicare Private Fee-For-Service implementation.

\*       \*       \*

*From a business perspective, the most significant changes in the guidance are in the area of Medicare Private Fee-For-Service and commercial risk revenue. On Medicare Private Fee- For-Service, our previous guidance had assumed 50,000 to 65,000 members with associated revenue of approximately $500 million. We now believe that we will get to 90,000 to 100,000 members by year-end and produce revenue closer to $700 million.*

Partially offsetting this revenue gain is a reduced revenue outlook for commercial risk, based on the expected loss of risk membership in the first quarter of 2007. While we expect to claw our way back towards flat by the end of the year as we have in the past, the lower-than expected risk membership during the year will bring the commercial risk revenue down from our previous expectation.

\*       \*       \*

### Carl McDonald, Analyst CISC:

First question is on Private Fee-For-Service, and essentially, it is — does the much better than -- expected growth there make you nervous in the sense that my analysis of some of the benefit designs and rates in the Private Fee-For-Service would suggest that you guys are offering better benefits at a lower cost than many of the competitors. So, how much of that do you think is influencing the growth, as opposed to distribution or some other advantage that you think you have?

### Defendant Wolf:

You know, when I was in my old job, Carl, I would have been nervous; now that I'm in my new job, I don't do nervous anymore; that's Shawn"s j ob.

You know, all I can tell you is that I think we put a pretty attractive product on the market in Part D in 2006. It wasn't the most attractive product on the market, but it was a pretty attractive product, *and it turned out we hit it just right in reaching balance between profitability and growth.*

Can I ever been 100% sure that we didn't err slightly on one side or another? Of course not. But I have a high degree of confidence in our financial and actuarial teams who built this. We didn't take any different approach to it than we did in the Part D or any of our other businesses, frankly, and we are not confused about – in this Company about profitability comes first and growth comes second.

So I feel very good about it. We'll see — time will tell.

(Emphasis added).

68.     On March 15, 2007, the Company issued a press release and announced that it had

won a 35,000 member Medicare PFfS employee-sponsored retiree contract.   The press release

stated in relevant part:

> Coventry Health Care Selected by the State of West Virginia
> Public Employees Insurance
>
> Agency to Provide Retiree Health Benefits Advantra Freedom Plan
> Preserves Current Benefits for Retirees and Spouses
>
> BETHESDA, Md. -- (BUSINESS WIRE) -- March 15, 2007 --
> Coventry Health Care, Inc. (NYSE: CVH) today announced that it
> was selected by the state of West Virginia's Public Employees
> Insurance Agency (PEIA) as the state's Medicare Advantage plan to
> provide health insurance for its 35,000 retirees effective July 1, 2007.
>
> "We are extremely pleased to expand our relationship with PEIA,"
> said Fran Soistman, Jr., executive vice president of Coventry
> Health Care. "Coventry Health Care and its Charleston based
> Carelink Health Plan have a long-standing relationship with
> PEIA's active employees, so we look forward to also serving its
> retirees and spouses." In addition to PEIA, Coventry serves
> approximately 80,000 other West Virginians through its
> commercial, Medicare Advantage and Medicaid programs.
>
> "The goal is to take care of our retirees who have taken care of the
> state over the years, and with Coventry's health plan and their
> national presence, we can do just that," said Ted Cheatham,
> director of West Virginia Public Employees Insurance Agency.
> "Not only does this help us preserve the level of benefits for our
> retirees, but it helps the state slow the growth of future liabilities in
> funding retiree benefits. It's a win for our retirees, our state and our
> taxpayers."
>
> Under the customized retiree benefit plan, both medical and
> prescription drug (Medicare Part D) coverage will be offered,
> including several drugs excluded from the Part D formularies.
> There is freedom to choose any provider with this plan, along with
> access to a 24-hour nurse line, enhanced clinical programs
> (voluntary disease and case management programs), and fitness
> programs. The retiree benefit plan also will offer free health risk
> assessments, social worker support and targeted support for those with
> serious medical needs.

69.     On March 19, 2007, Defendant Guertin spoke at a Lehman Brother Global

Healthcare Conference:

> Looking more specifically at the Medicare outlook for 2007, we are at or better than expectations, really for all three of our Medicare product lines, and our traditional HMO membership will be up 5% to 10%. Part D revenue will probably grow around 10% year over year. And we'll exceed our expectations and probably just about anyone's expectations on private fee-for-service with 135,000 new members and new revenue in excess of $900 million this year.

70.     On April 27, 2007, the Company issued a press release and announced its financial results for its first quarter of 2007.   For the quarter, the Company reported operating revenues of $2.24 billion and net earnings of $121.7 million, or $0.76 per diluted share. Defendant Wolf stated in relevant part:

> We are right on track for another year of strong growth in revenue and earnings per share. In the first three months of the year we announced a meaningful acquisition, repurchased four million shares, refinanced debt at favorable rates, and successfully launched Medicare PFFS. *We were able to accomplish all of these things while continuing to deliver the strong operational and financial results you have come to expect.*

(Emphasis added).

71.     The Company's financial results for its 2007 first quarter were also repeated in the Company's Form 10-Q filed with the SEC on or about May 10, 2007 (the "2007 IQ Form 10-Q"), which was signed by Defendants Wolf and Guertin. The 2007 IQ Form 10-Q represented in relevant part:

> Individual Consumer & Government Business Division
>
> Government revenue increased as a result of increased Medicare-Private-Fee-For-Service membership, Medicare Part D membership, and Medicaid membership. Medicare Part D revenue includes $66.2 million attributable to the estimation of Centers for Medicare and Medicaid Services (CMS) risk sharing payments. This risk sharing revenue represents the amount we would receive from CMS if we settled with CMS as of the end of the first quarter. *We expect the Medicare Part D program to be profitable on a full year basis and, as a result, expect that the risk-sharing revenue related to the 2007 contract year will reverse itself later in the year and will eventually be insignificant as of year end.*

23

Medicare risk premium yields per member per month increased as a result of the rate increases from the annual competitive bid filings for our Medicare Advantage products as well as from increases in risk factor adjustment scores for certain of our Medicare products. This average premium yield increase was partially offset by the addition of the new Medicare Private-Fee-For-Service business which has a lower premium yield than our existing Medicare Advantage business, given our individually distributed PFFS products generally do not include a pharmacy benefit. Medicaid premium yields increased as a result of rate increases in Missouri, our largest Medicaid market.

The increase in gross margin is driven by the increased business discussed above and is offset by the increased medical costs associated with this increased business. Medicare risk medical costs as a percentage of premium revenue increased over the prior year quarter as a result of the addition of new Medicare Private-Fee-For-Service business, which has a higher medical loss ratio given our individually distributed Private-Fee-For-Service products generally do not include a pharmacy benefit. Medicare Part D medical costs as a percentage of premium revenue has decreased over the prior year quarter as a result of favorable pharmacy cost trend as members move to generic brands. Medicaid medical costs as a percentage of premium revenue increased over the prior year quarter as a result of an increase in large claims incurred in Missouri, our largest Medicaid market.

(Emphasis added).

72.     With regard to the Company's outlook, the 2007 IQ Form 10-Q stated:

Individual Consumer & Government Division — our new product for 2007, Private-Fee-For- Service, is off to a very robust start and is being offered in 43 states. *By year-end, we are expecting 135,000 new members and almost $1 billion of new revenue.*

(Emphasis added).

73.     The 2007 IQ Form 10-Q also stated: "Based upon our valuation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective." Defendants Wolf and Guertin certified the accuracy of the Company's disclosure and internal control representations with the SEC in the 2007 1Q Form 10-Q.

74.     On July 31, 2007, the Company issued a press release and announced its financial results for its second quarter of 2007. The Company reported operating revenues of $2.33 billion

and net earnings of $ 151.3 million, or $0.96 per diluted share. Defendant Wolf stated in relevant

part:

> **I *am pleased to report another strong quarter from our well-diversified portfolio of businesses.*** The Commercial Business division reported an outstanding medical loss ratio, the Individual Consumer & Government Business division continued to display impressive growth, and the Specialty Business division performed very well as we successfully integrated the Concentra workers' compensation services businesses. In addition to delivering these reliable financial and operational results, we continue to deploy capital strategically and position the Company for future growth opportunities. (Emphasis added).

75.     The Company's financial results for its 2007 second quarter were repeated in the

Company's Form 10-Q filed with the SEC on or about August 8, 2007 (the "2007 2Q Form 10-

Q"), which was signed by Defendants Wolf and Guertin.    The 2007 2Q Form 10-Q stated in

relevant part:

> Individual Consumer & Government Business Division
>
> Quarters and Six Months Ended June 30, 2007 and 2006
>
> Government revenue increased for the quarter and six months ended June 30, 2007 from the same period in 2006 as a result of new membership from the Medicare PFFS business as well as the increased Medicare Part D, Medicaid and Individual membership. Medicare Part D revenue includes adjustments attributable to the estimation of Centers for Medicare & Medicaid Services ("CMS") Risk Sharing payments. The quarter ended June 30, 2007 includes a reduction of revenue of $31.7 million while the six months ended June 30, 2007 includes additional revenue of $34.5 million; these amounts are primarily related to the 2007 rate year. This risk sharing revenue represents the amount we would receive from CMS if we settled with CMS as of the end of the second quarter. We expect the Medicare Part D program to be profitable on a full year basis and, as a result, expect that the risk-sharing revenue related to the 2007 contract year will continue to reverse through the year. Medicare risk premium yields per member per month increased as a result of the rate increases from the annual competitive bid filings for our Medicare Advantage products as well as from increases in risk factor adjustment scores for certain of our Medicare products.
>
> This average premium yield increase was partially offset by the addition of the new Medicare Private-Fee-For-Service business which has a lower premium yield than our existing Medicare Advantage business, since our individually distributed PFFS

products generally do not include a pharmacy benefit. Medicare Part D premium yields have declined for both the three and six months ended June 30, 2007 compared to the same periods in 2006 primarily due to the lower CMS risk sharing accruals. The six months ended June 30, 2007 included $34.5M compared to $56.7 million for the same period in 2006. Medicaid premium yields increased as a result of rate increases in Missouri, our largest Medicaid market, effective July 1, 2006.

The increase in gross margin is driven by the increased business discussed above and is offset by the increased medical costs associated with this increased business. Medicare Part D medical costs as a percentage of premium revenue have decreased over the prior year quarter as a result of favorable pharmacy cost trend due to re-negotiated pharmaceutical contracts resulting from higher enrollment and as a result of members moving to generic drugs. Medicaid medical costs as a percentage of premium revenue increased over the prior year quarter as a result of an increase in large claims incurred in Missouri, our largest Medicaid market.

76.     The 2007 2Q Form 10Q also stated:

For the remainder of 2007, we have the following expectations for our three business lines:

Commercial Division - we expect that on an organic basis the health plan ASO membership will be slightly down at year-end as compared to our June 30, 2007 membership and expect Commercial group risk membership in the aggregate will be slightly up at year-end as compared to our June 30, 2007 membership.

***Individual Consumer & Government Division - for our new product for 2007, Private-Fee- Far-Service, we are expecting 150,000 members and more than $1 billion of revenue by year-end.***

Specialty Division - our acquisition of Concentra's workers compensation business, effective April 2, 2007 is expected to have a small favorable effect on earnings this year.

(Emphasis added).

77.     The 2007 2Q Form 10-Q also stated: "Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective." Defendants Wolf and Guertin certified the accuracy of the Company's disclosure and internal control representations with the SEC in the 2007 2Q Form 10-Q.

26

78.     On October 26, 2007, the Company issued a press release and announced its

financial results for its third quarter of 2007. The Company reported operating revenues of $2.52

billion and net earnings of $168.7 million, or $1.08 per diluted share. Defendant Wolf stated in

relevant part:

> ***I am pleased to present another quarter of impressive top and
> bottom line growth from our well-diversified portfolio of
> businesses.*** Seeking and seizing organic and acquisition
> opportunities should enable Coventry to grow operating revenue by
> more than 25% in 2007 and approaching 30% in 2008. This positions
> us well for another year of steady and reliable earnings growth in 2008.
> (Emphasis added).

79.     The Company's financial results for its 2007 third quarter were repeated in the

Company's Form 10-Q filed with the SEC on or about November 9, 2007 (the "2007 3Q Form

10-Q"), which was signed by Defendants Wolf and Guertin.

80.     The  2007 2Q Form 10-Q represented:

> Individual Consumer & Government Division
> Quarters and Nine Months Ended September 30, 2007 and 2006
>
> Government revenue increased for the quarter and nine months
> ended September 30, 2007 from the same periods in 2006 as a
> result of membership from our new Medicare PFFS business, as well
> as the increased Part D, Medicaid and Individual membership, both
> organic and acquired. Part D revenue includes adjustments attributable
> to the estimation of Centers for Medicare & Medicaid Services
> ("CMS") Risk Sharing payments. The quarter ended September 30,
> 2007 includes a reduction of revenue of $68.7 million, while the
> nine months ended September 30, 2007 includes a reduction of
> revenue of $34.2 million. The reduction of revenue of $34.2 million
> for the nine months ended September 30, 2007, represents the amount
> we would pay to CMS if we settled with CMS as of the end of the
> third quarter. We expect the Part D program to be profitable on a
> full-year basis and, as a result, expect that the reductions to revenue
> for the CMS risk-share related to the 2007 contract year will continue
> through the year.
>
> Medicare Advantage risk premium yields per member per month
> decreased as a result of the addition of our new Medicare Private-
> Fee-For-Service business, which has a lower premium yield than our
> existing Medicare Advantage business, since our individually
> distributed PFFS products generally do not include a pharmacy
> benefit. This average premium yield decrease was partially offset by

the rate increases from the annual competitive bid filings for our Medicare Advantage products, as well as from increases in risk factor adjustment scores for certain of our Medicare products. Part D premium yields have declined for both the three and nine months ended September 30, 2007 compared to the same periods in 2006 primarily due to the lower CMS risk sharing accruals as well as the annual competitive bid filings for our Part D products. The nine months ended September 30, 2007 included a reduction of revenue of $34.2 million compared to additional revenue of $15.7 million for the same period in 2006.

This change is a result of the improved profitability of the Part D program, which is discussed below. Medicaid premium yields increased as a result of rate increases in Missouri, our largest Medicaid market, effective July 1, 2006 and July 1, 2007.

The increase in gross margin was driven by the increased business discussed above and was offset by the increased medical costs associated with this increased business. Part D medical costs as a percentage of premium revenue have decreased over the prior year quarter as a result of favorable pharmacy cost trend due to re-negotiated pharmaceutical contracts resulting from higher enrollment and as a result of members moving to generic drugs. Medicaid medical costs as a percentage of premium revenue increased over the prior year nine month period as a result of an increase in large claims incurred in our Missouri market.

81.     The 2007 3Q Form 10-Q also disclosed: "Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective." Defendants Wolf and Guertin certified the accuracy of the Company's disclosure and internal control representations with the SEC in the 2007 3Q Form 10-Q.

82.     On January 7, 2008, the Company re-affirmed its earnings expectations of $1.17 to $1.18 per diluted share for fourth quarter 2007 and $4.42 to $4.58 per diluted share for full year of 2008.

83.     On February 8, 2008, the Company issued a press release and announced its financial results for the fourth quarter and year ended December 31, 2007. The Company reported operating revenues of $2.79 billion and net earnings of $184.3 million, or $1.18 per diluted share, during the fourth quarter 2007 and total revenues of $9.88 billion and net earnings

of $626.1 million, or $3.98 per diluted share for the year ended December 31, 2007. Defendant Wolf stated in relevant part:

>*Coventry's 2007 results were characterized by strong financial and operational performance, with the fourth quarter as no exception.* Our 2007 organic growth initiatives and capital deployment activities have positioned us well for another year with industry-leading revenue growth and steady and reliable earnings results. (Emphasis added).

84.     The Company's financial results for its 2007 fourth quarter and fiscal year were repeated in the Company's Form 10-K filed with the SEC on or about February 28, 2008 (the "2007 Form 10-K"), which was signed by Defendants Wolf and Guertin.

85.     The 2007 Form 10-K represented:

>Managed care premium revenue increased in both our Individual Consumer & Government and Commercial divisions. *The growth is a result of our new Medicare PFFS product, growth in existing products as well as from the acquisitions; each of which is described above.* Partially offsetting the increase was a decline in same store Commercial risk membership over the prior year period.

>Management services revenue increased compared to the prior year as a result of the acquisition of Concentra and Mutual described above. This increase was partially offset by membership losses in our Commercial Division's National Accounts business.

>Medical costs increased almost exclusively as a result of new business in both our Individual Consumer & Government Division and Commercial Division discussed above. Medical costs as a percentage of premium revenue ("medical loss ratio") increased 0.3% from the prior year as a result of slightly higher medical loss ratios, associated with acquired businesses and from our new Medicare PFFS business which has a slightly higher medical loss ratio than our overall business.

86.     The 2007 Form 10-K also represented:

>Coventry's management, including the principal executive officer and principal financial officer, is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting (as defined in Rule 13a-15(f) under the U.S. Securities Exchange Act of 1934) is a process designed to provide reasonable assurance regarding the reliability of financial

reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

Internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Company's assets; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that the Company's receipts and expenditures are being made only in accordance with authorizations of the Company's management and directors; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

Coventry's management has performed an assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2007 based on criteria established by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), Internal Controls - Integrated Framework, and believes that the COSO framework is a suitable framework for such an evaluation. Management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2007.

* * *

We have performed an evaluation as of the end of the period covered by this report of the effectiveness of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934 ), under the supervision and with the participation of our Chief Executive Officer and our Chief Financial Officer. Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective.

87.    Defendants Wolf and Guertin certified the accuracy of the Company's disclosure and internal control representations with the SEC in the 2007 Form 10-K.

88.    On March 17, 2008, the Company issued a press release that adjusted its 2008 guidance:

BETHESDA, Md. -- (BUSINESS WIRE) -- March 17, 2008 - Coventry Health Care, Inc. (NYSE: CVH) today announced that, after completing an analysis of financial results through February 2008 and a thorough review of each of the Company's lines of business, the Company expects full year GAAP earnings per share (EPS) on a diluted basis of $4.39 to $4.50, or growth of 10% to 13% from 2007. While still early in the year, the Company is pleased to report that all lines of business are performing well and that the underlying fundamentals continue to be sound. The Company will present at the Lehman Brothers Global Healthcare Conference in Miami, Florida, at 1:30 p.m. ET on Tuesday, March 18, 2008. The public may access a live webcast of the presentation and accompanying slides (which are being posted on the Investor Relations page of the Company's website simultaneously with the issuance of this press release) which will review highlights of the Company's business performance and financial outlook including the following:

The Company's view of stable commercial medical cost trends remains unchanged and the commercial group risk medical loss ratio (MLR) in 2008 is expected to be approximately flat as compared to 2007 on a "same store" basis.

The Company has experienced positive development on the December 2007 medical claims reserves at a level consistent with the Company's expectations. Therefore, based upon data from the first two months of 2008, the Company's estimates of medical costs incurred in 2007 appear to have been accurate.

Medicare Part D results remain on track with no changes to the expected full year MLR in the low 80%'s and first quarter MLR of approximately 104%.

The Company has added approximately 29,000 Medicare Advantage members in the first two months of 2008 and forecasts Medicare Advantage performance consistent with previous expectations, excluding the impact of influenza-related costs in Q1 2008 as discussed below.

The Company's Medicaid risk business is performing on track with previous guidance.

The Company has been monitoring the impact of the following matters and has identified two developments which differ from our previous expectations:

Influenza levels in the first quarter of 2008 have been elevated to date but appear to be subsiding as of March 15, 2008. The Company expects the impact of influenza-related medical costs across all lines of business to be approximately $10.0 million higher ($0.04 per diluted share) than originally anticipated in its forecast for the first quarter of 2008. This matter is expected to only impact the first quarter of 2008.

As a result of recent Federal Reserve actions to reduce the Federal Funds Rate, the Company has experienced greater than anticipated downward pressure on net investment income in the first quarter of

2008. The Company also expects continued downward pressure for the remainder of the year as the Federal Reserve continues to reduce the Federal Funds Rate. The Company expects net investment income will be $9.0 million lower ($0.04 per diluted share) than previously expected with the impact generally being realized evenly throughout each quarter of 2008.

"Not withstanding the downward adjustment to our full year EPS range, we are very pleased with the consistent performance and strong, fundamentally sound positioning of our ongoing businesses," said Shawn Guertin, chief financial officer of Coventry Health Care. "We continue to feel confident about each of our business lines, the results of our recent acquisitions, the success of our organic growth initiatives and our long term strategic positioning."

Accordingly, the Company is providing revised consolidated guidance for full year 2008 as follows:

\*       \*       \*

Consolidated revenues of $11.99 billion to $12.49 billion

Consolidated MLR% of 79.9% to 80.3%

Cost of sales expense of $160.0 million to $180.0 million

GAAP EPS on a diluted basis of $4.39 to $4.50.

89.     On April 25, 2008, the Company issued a press release and announced its financial results for its first quarter of 2008. The Company reported operating revenues of $2.94 billion and net earnings of $125 million, or $0.81 per diluted share. The Company also reiterated its 2008 earnings guidance. Defendant Wolf stated in relevant part:

Consistent with our comments in mid-March, *we are pleased to confirm that our businesses continue to perform well and are fundamentally sound.* We are on track for another year of industry leading revenue growth and remain very confident about our strategic positioning and growth prospects for the future. (Emphasis added).

90.     The Company's financial results for its 2008 first quarter were repeated in the Company's Form 10-Q filed with the SEC on or about May 12, 2008 (the "2008 1Q Form 10-Q"), which was signed by Defendants Wolf and Guertin.

91.     The 2008 1Q Form 10-Q represented in relevant part:

> Individual Consumer & Government Division
>
> Individual Consumer & Government Division revenue increased from the prior year quarter as a result of membership growth from our Medicare Advantage business, as well as increased Medicare Part D, Medicaid and Individual membership, both organic and acquired.
>
> Medicare Advantage risk premium yields, excluding the impact of revenue ceded to external parties, per member per month increased as a result of the rate increases from the annual competitive bid filings for our Medicare Advantage products. With the effect of the ceded revenue being included in the premium yield, the Medicare Advantage risk premium yields per member per month decreased to $753.55 in 2008 from $810.08 in 2007. The decrease is a result of a larger portion of our Medicare Private-Fee-For-Service ("PFFS") business in 2008 being ceded to external parties through quota share arrangements. This average premium yield decrease was partially offset by the annual competitive bid filings noted above.
>
> Part D premium yields, excluding the impact of CMS risk sharing premium adjustments and revenue ceded to external parties, have declined in the first quarter of 2008 compared to same quarter of 2007 primarily due to the annual competitive bid filings for our Part D products as well as the mix of products sold. Including the effect of the CMS risk sharing premium adjustments as well as the ceded revenue, the yields were $110.73 in 2008 compared to $119.84 in 2007.
>
> When reviewing the premium yield for Medicare Advantage and Part D business, adjusting for the ceded revenue is useful for comparisons to competitors that may not have similar ceding arrangements. When reviewing the Medicare Part D business, adjusting for the risk share amounts is useful to understand the results of the Part D business because of our expectation that the risk sharing revenue will eventually be insignificant on a full year basis.
>
> Medicaid premium yields increased as a result of a rate increase in Missouri, our largest Medicaid market, effective July 1, 2007, as well as the inclusion in our results of Vista, which has a higher Medicaid premium yield.
>
> The increase in gross margin was driven by the membership growth, both organic and acquired, as discussed above, partially offset by the increased medical costs associated with this membership growth. Medicare Part D medical costs as a percentage of premium revenue have increased over the prior year quarter as a result of a widening of the risk corridors and growth in our low-income auto-assign population in 2008. Medicaid medical costs as a percentage of premium revenue decreased over the prior year quarter as a result of the premium yield increases discussed above.

92.     The 2008 1Q Form 10-Q also represented:

33

We are forecasting growth in diluted earnings per share of 10% to 13% in 2008.

With respect to our business divisions:

Commercial Division -- After our membership loss in the first quarter, we expect to grow commercial risk membership for the remaining three quarters of 2008 and remain relatively flat compared to December 31, 2007. The commercial group risk medical loss ratio is expected to be in the mid to high 78%'s, including the effect of acquisitions.

Individual Consumer & Government Division -- This division is expected to have another year of strong growth. We expect continued growth in Medicare Advantage in 2008 and we are expecting 100,000 new members in 2008, including a large group effective May 1, 2008.

Medicare Part D increased approximately 150,000 members in the first quarter of 2008. We expect the Medicare Part D membership to be level for the remainder of the year. With respect to Medicaid, as previously disclosed, we were notified of the termination of our Pennsylvania Medicaid behavioral health contract representing approximately 107,000 members, effective July 1, 2008. Given the nature of this globally capitated contract, we earn a low single digit operating margin. Our core Medicaid risk business performed well in the first quarter of 2008 and we expect that to continue throughout 2008.

Specialty Division - Our workers' compensation services continue to experience meaningful year over year growth and we expect this to continue throughout 2008. We continue to seek additional strategically related businesses for this division, most recently acquiring MHNet, a mental-behavioral health company, as discussed above.

93.    The 2008 1Q Form 10-Q also represented: "Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective." Defendants Wolf and Guertin certified the accuracy of the Company's disclosure and internal control representations with the SEC in the 2008 1Q Form 10-Q.

94.    On June 18, 2008, the Company issued a press release and announced that it had revised its 2008 outlook, reducing second quarter and full year 2008 earnings per share estimates. The press release stated in relevant part:

Based upon a review of each line of business, the Company has observed and quantified the following developments contributing to the revised expectations and guidance:

34

-- Medicare Advantage Medical Loss Ratio (MLR). The Company expects the 2008 Medicare Advantage medical loss ratio to be between 85.5% and 85.9%, an increase of approximately 300 to 340 bps from the Company's prior estimate. The driver of this change is the Company's Medicare Advantage Private Fee-for-Service (PFFS) business. The Company has received a much higher than expected level of PFFS claims related to prior periods, which is inconsistent with claims submission patterns of network-based Medicare Advantage products. As a result, the Company is projecting negative development of PFFS reserves related to 2007 of approximately $50.0 million. The Company is forecasting the overall Medicare Advantage MLR to be between 87.2% and 87.6% for the first half of 2008, inclusive of the negative development outlined above and a revised view on 2008 PFFS performance. The Company is forecasting the overall Medicare Advantage MLR to be between 84.0% to 85.0% for the second half of 2008. The higher than previously expected Medicare Advantage MLR has resulted in a reduction of $0.42 per diluted share to the midpoint of the Company's 2008 EPS guidance.

Commercial Group Risk MLR. The commercial group risk MLR is being pressured by higher than expected levels of outpatient utilization and, to a lesser extent, a higher than expected inpatient unit cost trend caused by an increased severity level of facility claims. The Company's revised 2008 health plan commercial group risk MLR forecast is approximately 80.3% versus previous guidance of approximately 78.8%. Based upon estimates through May 2008, the Company expects the second quarter MLR to be in the range of 82.3% to 82.7% with the first half of 2008 MLR in the range of 80.6% to 80.8%. The second half of 2008 is expected to run at an MLR of approximately 80.0%. The Company has initiated forward pricing action to reflect the higher than expected trend. The higher than previously expected commercial group risk MLR has resulted in a reduction of $0.32 per diluted share to the midpoint of the Company's 2008 EPS guidance.

Other Modifications. The Company is revising its revenue outlook from a midpoint of 23.9% growth over the prior year to a midpoint of 20.7%. The reduction in risk revenue guidance is primarily driven by the full year outlook on commercial group risk membership which is expected to be down by approximately 4.0% from prior year (although slightly up for the remainder of 2008 as compared to Q108), and an anticipation of Medicare Advantage membership growth in 2008 of approximately 90,000 members compared to a previous forecast for growth of 100,000 members. The decrease in management services revenue guidance is driven by a lower than expected level of bill volume in the Company's workers' compensation services business. Offsetting these decreases to the top-line are forecasted reductions in operating costs, including actions planned by the Company, and improvements in non-operating items. These modifications to operating items have resulted in a reduction to the midpoint of the Company's 2008 EPS guidance of $0.09 per diluted share which is offset by the favorable $0.09 per diluted share impact of the non-operating changes to the Company's 2008 EPS guidance.

35

95.    Defendant Wolf stated in relevant part:

> We are very disappointed with the April and May 2008 results and their anticipated effect on the second quarter and the full year. We have implemented corrective actions that we anticipate will put us back on an acceptable EPS growth path for 2009 and beyond.

96.    In response to the Company's earnings announcement, the price of Coventry stock declined by more than 22% from $40.00 to $31.30 per share on very heavy trading volume.

97.    On July 25, 2008, the Company issued a press release and announced its financial results for its second quarter of 2008. The Company reported operating revenues of $2.98 billion and net earnings of $83.2 million, or $0.55 per diluted share.

98.    Coventry's financial results for its 2008 second quarter were repeated in the Company's Form 10-Q filed with the SEC on or about August 7, 2008 (the "2008 2Q Form 10-Q"), which was signed by Defendants Wolf and Guertin.

99.    The 2008 2Q Form 10-Q represented:

> Individual Consumer & Government Division Quarters and
> Six Months Ended June 30, 2008 and 2007
>
> Individual Consumer & Government Division revenue increased for the quarter and six months ended June 30, 2008 from the same periods in 2007 as a result of membership growth from our Medicare Advantage business, as well as increased Medicare Part D, Medicaid and Individual membership, both organic and acquired.
>
> Medicare Advantage risk premium yields, excluding the effect of revenue ceded to external parties, per member per month increased as a result of the rate increases from the annual competitive bid filings for our Medicare Advantage products as well as from increases in risk factor adjustment scores for our Medicare Advantage products. With the effect of the ceded revenue being included in the premium yield, the Medicare Advantage risk premium yields per member per month for the six month period ending June 30 decreased to $747.36 in 2008 from $802.97 in 2007. The decrease is a result of a larger portion of our Medicare PFFS business in 2008 being ceded to external parties through quota share arrangements. This average premium yield decrease was partially offset by the annual competitive bid filings and risk factor scores noted above.

Part D premium yields for the six month period ending June 30, 2008 excluding the effect of CMS risk sharing premium adjustments and revenue ceded to external parties, have declined in 2008 compared to 2007 primarily due to the annual competitive bid filings for our Part D products as well as the mix of products sold. Including the effect of the CMS risk sharing premium adjustments as well as the ceded revenue, the yields were $92.60 in 2008 compared to $99.26 in 2007.

When reviewing the premium yield for Medicare Advantage and Part D business, adjusting for the ceded revenue is useful for comparisons to competitors that may not have similar ceding arrangements. When reviewing the Medicare Part D business, adjusting for the risk share amounts is useful to understand the results of the Part D business because of our expectation that the risk sharing revenue will eventually be insignificant on a full year basis.

Medicaid premium yields increased for the quarter and six month 2008 periods as a result of a rate increase in Missouri, our largest Medicaid market, effective July 1, 2007, as well as the inclusion in our results of Vista, which has a higher Medicaid premium yield.

The decrease in gross margin for the quarter ended June 30, 2008 was driven by increased medical costs associated with our Medicare PFFS business in 2008. This decrease is partially offset by higher gross margins for our Medicaid HMO and Individual businesses associated with the membership growth, both organic and acquired, as discussed above. Medicare Part D medical costs as a percentage of premium revenue have increased over the prior year quarter as a result of a widening of the risk corridors and growth in our low income auto-assign population in 2008. Medicaid medical costs as a percentage of premium revenue decreased over the prior year quarter as a result of the premium yield increases discussed above.

100.    The 2008 2Q Form 10-Q also disclosed:

Within our suite of Medicaid products, as previously disclosed, we were notified of the termination of our Pennsylvania Medicaid behavioral health contract representing approximately 107,000 members, effective July 1, 2008. Given the nature of this globally capitated contract, we earned a low single digit operating margin. Our core Medicaid risk business performed well in the first half of 2008 and we expect that to continue throughout 2008.

101.    The 2008 2Q Form 10-Q also disclosed: "Based upon our evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and

procedures are effective." Defendants Wolf and Guertin certified the accuracy of the Company's disclosure and internal control representations with the SEC in the 2008 2Q Form 10-Q.

102.    The statements referenced above were inaccurate when made because they misrepresented and failed to disclose at least the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a) the Company employed under-pricing strategies to create the appearance that its new Medicare PFFS initiative was capable of driving the high growth necessary to offset Coventry's contracting Commercial business;

(b) the Company failed to disclose the true risks associated with its under-pricing strategies, including the fact that the Company was generating new Medicare PFFS membership at the expense of profit margins and profitability;

(c) the true negative affects of the Company's under-pricing strategies were masked by improper claims assumptions that materially understated the Company's healthcare claim expenses;

(d) the Company's disclosure and internal controls representations, and Defendants Wolfs and Guertin's certifications thereon, were inaccurate when made; and

(e) as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, its prospects and earnings guidance during the Class Period.

103.    On October 21, 2008, the Company issued a press release and announced its financial results for its third quarter of 2008. The Company reported operating revenues of $2.98 billion and net earnings of $85.5 million, or $.58 per diluted share. Defendant Wolf stated in relevant part:

Our results for 2008 are unacceptable, and a great disappointment to me and the entire Company. However, we have identified and

understand the issues that have affected our results. We have implemented a corrective action plan which we expect will increasingly be reflected in the Company's results throughout 2009 and fully realized in 2010. Most importantly, I continue to have confidence in our future prospects, both strategically and financially.

104.   Defendant Guertin, on a conference call, stated:

Make no mistake here, we have identified the areas pressuring operating results this year, and have implemented action plans to improve our performance. What we cannot change here is the calendar, which impacts the timing of when we see the positive impacts of all of our actions, nor can we control the unprecedented economic factors that seem to impact the landscape each and every day.

As you saw in the press release, upon observing higher than expected medical loss ratios on commercial in the third quarter, we once again tore apart each of our commercial health plans to get at the drivers of this pressure. Here we had the benefit of an additional quarter of completed data from 2008 for our analysis. There were four key conclusions that have emerged from this review; one, following the second quarter we believed the core medical trend in 2008 was 150 basis points higher than expected. The good news here is that the third quarter review showed that the core medical trends results were no worse than this. This is very important.

As you know, we implemented forward pricing action earlier this year assuming 150 basis points of elevated trend, and some additional margin for any further deterioration. This estimate still appears accurate, and as it pertains to the core medical trend we have not seen any further deterioration.

The second conclusion was that we were experiencing some additional MLR pressure that we tracked back to more subtle pricing and underwriting issues in two specific health plans. The nature of the issues we uncovered are not simple, easy to identify issues like "I wanted a certain price, and that price was cut." They have more to do with the interplay between underwriting risk assessment and pricing factors as well as some of the more detailed factors in the underwriting and pricing model itself.

The nature of most of these items is not that business that was written was unprofitable, rather it was less profitable than it had been historically and less profitable than what we assumed in our forecasts. The impact of these issues added 70 basis points to our outlook on full year commercial MLR. Needless to say, as a result of these reviews, all the changes needed to address these issues have been put in place as we speak today.

The third conclusion was that having a full year of Vista versus three plus months last year was having a bigger impact on the commercial MLR than we had previously thought. You will recall that our prior guidance assumed that the MLR in 2008 would be 50 basis points

higher than 2007, due to this factor. An examination of updated experience for this year shows that this will be closer to 95 basis points or an increase of 45 basis points from our previous estimate. Let me be clear on this topic, this is still a very good and important asset for the company, and I have every confidence in the team we have in place in south Florida. It is the nature of this business that this calendar year's results are largely a reflection of operating action taken prior to our ownership.

The final conclusion from this review was that we had seen significant MLR deterioration on our federal employee HMO business. This is not mail handlers, but rather the risk HMO business we're in out of each of our health plans. As you all know this business is what we refer to as slice where we are one of multiple options. It would appear at this point that we have experienced a significant degree of adverse selection in the most recent renewal cycle, which has caused the MLR deterioration in this block of business. The overall impact of this issue is an increase of 25 basis points from our previous MLR guidance. We have already set our participation in this program for 2009, and while we have made some changes to premiums and benefits, the jury is still out on what will happen to this block from both a membership and MLR perspective in 2009. But clearly, any ongoing result like this would warrant consideration of a different path for 2010.

Let me conclude my comments on the commercial business by reiterating that our fundamental outlook on trend for 2008 and 2009 is the same as a quarter ago, at 9% plus or minus 50 basis points. As you know, we decisively implemented forward pricing action earlier this year; in addition, this quarter we have made additional pricing changes on top of this to deal with the specific issues we found. All of our health plans are actively working on initiatives to improve medical expense trend outcomes in 2009. The biggest question in my mind today is not whether we will fix this issue, but all things being equal, how much of it will show up in 2009 before it fully shows up in 2010.

Let me start out on Medicare Private Fee for Service by clarifying what this is and isn't as it pertains to the third quarter developments. This is not an issue that has anything to do with any additional reserve development back to 2007, nor is it any issue with any internal claim payment practices. Those issues were identified and fully corrected in the second quarter. It is an issue about current year 2008 performance on this product. To no surprise, revenue per member in 2008 is largely as expected. The problem, therefore, is being driven on the medical expense side and in particular on our individual products as opposed to our group products.

We are experiencing trends in 2008 of around 9% on the individual business versus a comparable expected trend in the 5% range. You will recall that on this product we pay Medicare rates to providers, so with the exception of the implementation of MS-DRGs in the fourth quarter of 2007, the variances from expected results are largely driven by higher than expected utilization, with the biggest variance being observed in the outpatient category. Looking deeper into

this, we can also see that one of our particular individual plan offerings is the real culprit here. In essence our individual membership is primarily distributed across three plans; one is a richer premium bearing product, while the other two are leaner plan designs with zero premiums.

In 2008 this richer premium bearing product is running a loss ratio in the mid to upper 90s, while the zero premium products are running in the mid to upper 80s. In our 2009 bids we have made some meaningful redesigns of this particular product in terms of where it is offered, the benefit plan design, and the corresponding premiums. The ultimate impact of these specific changes, as well as the refinement of our view on 2009 performance of Private Fee for Service in total, will clearly be front and center over the next couple of months.

105.    In response to these announcements, the price of Coventry stock declined from $28.49 per share to $13.93 per share, or more than 51%, on very heavy trading volume.

106.    Defendants were motivated to engage in this course of conduct in order to allow them and other Company insiders to sell more than 800,000 shares of their personally-held Company stock for gross proceeds in excess of $46 million.

## MISMANAGEMENT OF PLAN ASSETS

107.    Pursuant to ERISA § 404(a), 29 U.S.C. § 1104(a), at all times relevant to this Complaint, Defendants had a duty to discharge their duties with respect to the Plan with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims, and to diversify investments in the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

108.    Defendants are not entitled to the protections of ERISA § 404(c), 29 U.S.C. § 1104(c), because (i) Plan participants did not exercise independent control over their accounts, (ii) Defendants subjected participants to improper influence with respect to the Plan's investments in Coventry common stock, and (iii) Defendants concealed material non-public information concerning Coventry that Defendants were not precluded from disclosing under applicable law.

41

109.   During the Class Period, Coventry common stock was an imprudent Plan investment because *inter alia*, Coventry (i) employed under-pricing strategies to create the appearance that its new PFFS initiative was capable of driving the high growth necessary to offset Coventry's contracting Commercial business; (ii) failed to disclose the true risks associated with its under-pricing strategies, including the fact that the Company was generating new Medicare PFFS membership at the expense of profit margins and profitability; (iii) masked the true negative effects of its under-pricing strategies by improper claims assumptions that materially understated Coventry's healthcare claim expenses; (iv) issued materially inaccurate disclosure and internal control representations; and (v) lacked a reasonable basis for  positive statements about the Company's prospects and earnings guidance during the Class Period.

110.   Defendants breached their fiduciary duties when they failed to conduct an appropriate investigation into whether Coventry stock was a prudent investment for the Plan; failed to develop appropriate investment guidelines for Coventry stock; failed to divest the Plan of Coventry stock; failed to discontinue further contributions (including matching Company contributions) of Coventry stock to the Plan; failed to remove Coventry stock as an investment option for the Plan; failed to either consult or appoint independent fiduciaries regarding the appropriateness of an investment in Coventry stock; and failed to resign as fiduciaries of the Plan if as a result of their employment by Coventry they could not loyally serve the Plan and its participants.

111.   Further, Defendants breached their fiduciary duties by direct and indirect communications with the Plan's participants, made in their fiduciary capacity, which contained statements concerning Company stock that these Defendants knew or should have known were untrue and inaccurate.  These communications included Class-wide and Plan-wide affirmative and

42

materially misleading statements as to Coventry's business and operations as detailed in this Complaint, that were contained in the Company's public filings that, upon information and belief, were incorporated into the Plan's SPD.

## CAUSES OF ACTION

### COUNT I

#### *Failure to Prudently and Loyally*
#### *Manage the Plan and the Plan's Assets*

#### *(Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)*

112.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

113.    At all relevant times, as alleged above, Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

114.    As alleged above, Defendants were all responsible, in different ways and to differing extents, over management of the Plan or disposition of the assets of the Plan and were, during the Class Period, responsible for ensuring that the Plan's investment options, including the Company common stock, made available to Plan participants, were prudent and are liable for losses incurred as a result of such investments being imprudent.

115.    Additionally, pursuant to ERISA, fiduciaries are required to disregard plan documents or directives they know or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, fiduciaries may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow

43

others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

116.    Defendants were obligated to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.   ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

117.    According to the DOL regulations and case law interpreting ERISA § 404, a fiduciary's investment or investment course of action is prudent if:   a) he or she has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and b) he or she has acted accordingly.

118.    Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

o   The composition of the portfolio with regard to diversification;

o   The liquidity and current return of the portfolio relative to the anticipated cash
    flow requirements of the plan; and

o   The projected return of the portfolio relative to the funding objectives of the
    plan.

119.   Given the conduct of the Company as described above, Defendants could not possibly have acted prudently during the Class Period when they continued to invest the Plan's assets in Coventry stock because, among other reasons, the Company: (i) employed under-pricing strategies to create the appearance that its PFFS initiative was capable of driving the high growth necessary to offset Coventry's contracting Commercial business; (ii) failed to disclose the true risks associated with its under-pricing strategies, including the fact that the Company was generating new Medicare PFFS membership at the expense of profit margins and profitability; (iii) masked the true negative effects of its under-pricing strategies by improper claims assumptions that materially understated Coventry's healthcare claim expenses; (iv) issued materially inaccurate disclosure and internal control representations; and (v) lacked a reasonable basis for  positive statements about the Company's prospects and earnings guidance.

120.   Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period, Defendants knew or should have known that Coventry stock was not a suitable and appropriate investment for the Plan as described herein.  Nonetheless, during the Class Period, Defendants continued to invest the Plan's assets in Coventry stock and to direct and approve the ongoing, automatic investment of the future Company contributions in Coventry stock, instead of other, more suitable, investments.  Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take adequate

steps to prevent the Plan, and indirectly Plan participants and beneficiaries, from suffering losses as a result of the Plan's investment in Coventry stock

121.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and other Plan participants and beneficiaries, lost a significant portion of their retirement investment.

122.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Defendants named in this count, are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT II

### *Failure to Provide Complete and Accurate Information to Participants and Beneficiaries*

### *(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by All Defendants)*

123.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

124.    As alleged above, during the Class Period, all Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

125.    As alleged above, the scope of the fiduciary responsibilities of all Defendants, to differing extents, included disseminating Plan documents and/or Plan-related information to participants regarding the Plan and/or assets of the Plan.

126.    The duty of loyalty under ERISA required Defendants to speak truthfully to participants, in their communications, including certain public filings with the SEC, incorporated

into the SPD; not to mislead them regarding the Plan or the Plan's assets; and to disclose information that participants need in order to exercise their rights and interests under the Plan.

127.     This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the prudence of maintaining investment in the Plan, so that participants can make informed decisions with regard to their investment options available under the Plan.

128.     This fiduciary duty to honestly communicate with participants is designed not merely to inform participants and beneficiaries of conduct, including potentially illegal conduct, bearing on their retirement savings, but also to forestall such misconduct in the first instance.  By failing to discharge their disclosure duties, Defendants facilitated the misconduct in the first instance.

129.     Defendants breached their fiduciary duties by failing to provide the Plan's participants with complete and accurate information regarding: (i) Coventry's under-pricing strategies undertaken to create the appearance that its new PFFS initiative was capable of driving the high growth necessary to offset the Company's contracting Commercial business; (ii) the true risks associated with Coventry's under-pricing strategies, including the fact that the Company was generating new Medicare PFFS membership at the expense of profit margins and profitability; (iii) the true negative effects of Coventry's under-pricing strategies that led to materially understated healthcare claim expenses; (iv) Coventry's issuance of materially inaccurate disclosure and internal control representations; and (v) the Company's lack of a reasonable basis for  positive statements about its prospects and earnings guidance during the Class Period.

47

130.    Had the Defendants not constantly reinforced the safety, stability and prudence of investment in Coventry stock during the Class Period, Plan participants, to the extent they were permitted, could have divested their holdings of Company stock in the Plan or at least diversified such holdings, thereby mitigating the Plan's losses.

131.    Defendants in this Count are also liable as co-fiduciaries because they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding Coventry stock, despite knowledge of their breaches.  Further, they enabled such conduct as a result of their own failure to satisfy their fiduciary duties and as a result of having knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to Plan participants, yet not making any effort to remedy the breaches.

132.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment.  Here, the above-described statements, acts and omissions of the Defendants in this Count constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investing the Plan's assets in Coventry stock, were material to any reasonable person's decision about whether or not to invest or maintain any part of their retirement assets in Coventry stock during the Class Period.  Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of Defendants named in this Count.

133.    Plaintiff further contends that the Plan suffered a loss, and Plaintiff and the other Class members suffered losses, by the above-described conduct of Defendants named in this

Count during the Class Period because that conduct fundamentally deceived Plaintiff and the other Class members about the prudence of making and maintaining retirement investments in Coventry stock, and that, in making and maintaining investments in Coventry stock, Plaintiff and the other Class members relied to their detriment upon the materially deceptive and misleading statements, acts and omissions of Defendants named in this Count.

134.     As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  If Defendants had discharged their fiduciary duties to prudently disclose material information, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the other Plan participants, lost a significant portion of their retirement savings.

135.     Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

### COUNT III

#### *Failure to Monitor Fiduciaries*

#### *(Breaches of Fiduciary Duties in Violation of ERISA § 404 by Defendant Coventry, The Director Defendants and Defendant Guertin)*

136.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

137.     This Count alleges fiduciary breach against the following Defendants: Coventry, the Director Defendants and Defendant Guertin (the "Monitoring Defendants").

#1185003v.1

138.    As alleged above, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

139.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, and remove, and thus, monitor the performance of other Plan fiduciaries, including the members of the Plan Committees.

140.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

141.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

142.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan

50

assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

143.     Here, the Monitoring Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Coventry stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries appreciated the huge and unjustified risk of significant investment loss by rank and file employees in their Plan accounts.

144.     In addition, the Monitoring Defendants, in connection with their monitoring and oversight duties, were required to disclose to those they monitored accurate information about the financial condition and practices of Coventry that they indisputably knew or should have known, that the monitored Plan fiduciaries needed to make sufficiently informed fiduciary investment decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, the Monitoring Defendants breached their fiduciary duties under the Plan and ERISA.

145.     The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in the fiduciary breaches by the monitored Defendants, they enabled the breaches by these Defendants and they had knowledge of these breaches, yet did not make any effort to remedy the breaches.

146.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the other Plan participants and beneficiaries, lost a significant portion of their retirement investment.

147.     Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused

by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**COUNT IV**

*Breach of Duty to Avoid Conflicts of Interest*

*(Breaches of Fiduciary Duties in Violation of ERISA § 404 by
The Director Defendant and, Defendant Guertin)*

148.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

149.     At all relevant times, as alleged above, the Director Defendants and Defendant Guertin were Plan fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

150.     ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

151.     The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

152.     Here, the Director Defendants and Defendant Guertin had an interest in ensuring that the Plan's assets were also heavily invested in Coventry stock on a regular, ongoing basis. Elimination of Company stock as an investment option for the Plan would have reduced the overall market demand for Coventry stock and sent a negative signal to Wall Street analysts, which would have adversely affected the price of Coventry stock, resulting in losses for Defendants named in this Count.

52

153.    During the Class Period, the Director Defendants and Defendant Guertin placed their own interest in investing the Plan's assets in Coventry stock over the Plan's participants' interest in maintaining a diversified and prudently invested ERISA plan.  These conflicts of interest put Defendants in the inherently problematic position of having to choose between their own interests as directors, officers, executives (and Company stockholders), and the interests of the Plan's participants, in whose interests Defendants were obligated to loyally serve with an "eye single."

154.    The Director Defendants and Defendant Guertin breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*:  failing to engage an independent fiduciary who could make independent judgments concerning the Plan's investment in Coventry stock; failing to notify appropriate federal agencies, including the DOL, of the facts that made Coventry stock an imprudent Plan investment; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; and by failing to otherwise place the interests of the Plan's participants above the interests of themselves and the Company with respect to the Plan's investment in Coventry stock.

155.    As a result of the Director Defendants and Defendant Guertin's breach of their duty to avoid conflicts of interest, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries suffered damages, the exact amount of which will be determined at trial.

156.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants named in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT V

### Co-Fiduciary Liability

### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by Defendants Coventry, The Director Defendants and Defendant Guertin )

157.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

158.    This Count alleges co-fiduciary liability against the following Defendants: Coventry, the Director Defendants and Defendant Guertin (the "Co-Fiduciary Defendants").

159.    As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

160.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he or she may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Co-Fiduciary Defendants breached all three provisions.

161.    **Knowledge of a Breach and Failure to Remedy**:  ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, that fiduciary has knowledge of a breach by such other fiduciary, unless it makes reasonable efforts under the circumstances to remedy the breach.  Here, the Co-Fiduciary Defendants knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

#1185003v.1

162.    Coventry, through its officers, directors and employees, engaged in inappropriate business practices, withheld material information from the market, provided the market with misleading disclosures, and profited from such practices, and, thus, knowledge of such practices is imputed to Coventry as a matter of law.

163.    The Director Defendants and Defendant Guertin, by virtue of their directorial or executive positions at Coventry, participated in and/or knew about the Company's inappropriate business practices, and their consequences, including the artificial inflation of the value of Coventry stock.

164.    Because the Co-Fiduciary Defendants knew of the Company's improper business practices, they also knew that the Investment Committee Defendants and Defendant Davis were breaching their duties by continuing to invest the Plan's assets in Coventry stock when it was no longer prudent to do so, and providing incomplete and inaccurate information to Plan participants. Yet, the Co-Fiduciary Defendants failed to undertake any effort to remedy these breaches. Instead, they compounded them by obfuscating the risk that the Company's improper business activities posed to Coventry, and, thus, to the Plan.

165.    **Knowing Participation in a Breach:**  ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach.  Coventry knowingly participated in the fiduciary breaches of the Investment Committee Defendants and Defendant Davis in that it benefited from the sale or contribution of its stock at artificially inflated prices.  Further, Coventry, as *de facto* fiduciary, participated in all aspects of the fiduciary breaches of the other Defendants.  Likewise, the Director Defendants and Defendant Guertin

knowingly participated in the breaches of the Investment Committee Defendants and Defendant Davis because, as alleged above, they had actual knowledge of the Company's improper conduct and yet, ignoring their oversight responsibilities, permitted the Investment Committee Defendants and the Defendant Davis to breach their duties.

166.     **Enabling a Breach.**  ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

167.     The failure of Co-Fiduciary Defendants to monitor the Investment Committee Defendants and Defendant Davis enabled those Defendants to breach their duties.

168.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the other Plan participants and beneficiaries, lost a significant portion of their retirement savings.

169.     Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## CAUSATION

170.     The Plan suffered millions of dollars in losses because a significant percentage of the Plan's assets was imprudently invested or allowed to be imprudently invested by Defendants in Coventry stock during the Class Period, in breach of Defendants' fiduciary duties.  This loss was reflected in the diminished individual account balances of Plan participants.

171.     Defendants are liable for the Plan's losses in this case because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant

control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants withheld material facts from Plan participants, and provided inaccurate and incomplete information to them regarding the true health and ongoing profitability of Coventry, and its soundness as an investment vehicle. As a consequence, Plan participants did not exercise independent control over their investments in Coventry stock, and Defendants remain liable under ERISA for losses caused by such investment.

172.    Had Defendants properly discharged their fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Coventry stock, eliminating Coventry stock as the primary investment alternative when it became imprudent, and divesting the Plan of its holdings of Coventry stock when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered through its continued investment in Coventry stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

173.    Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been so heavily invested in the Coventry equity during the Class Period.

174.    As a consequence of the Defendants' breaches, the Plan suffered significant losses.

175.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . .

#1185003v.1

. to make good to such plan any losses to the plan.. ..." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate. ..."

176.    With respect to calculation of the losses to the Plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available (as they were here, in the equities of other Companies), that the investments made or maintained in Coventry stock would have instead been made in the most profitable alternative investment available.   In this way, the remedy restores the Plan's lost value and puts the participants in the position they would have been in if the Plan had been properly administered.

177.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (i) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2) and (3), 29 U.S.C. §§ 1109(a) and 1132(a)(2); (iii) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (iv) taxable costs and interests on these amounts, as provided by law; and (v) such other legal or equitable relief as may be just and proper.

178.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan in this case.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

A.     A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.     A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.     Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.     An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had their accounts invested in the common stock of Coventry maintained by the Plan in proportion to the accounts' losses attributable to the precipitous decline in the Coventry equity;

H.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.     An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

#1185003v.1

J.    An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants, including appropriate modifications to the Plan to ensure against further violations of ERISA.

Dated: <u>November 16, 2009</u>

**TYDINGS & ROSENBERG LLP**

By:

John B. Isbister, Fed. Bar No. 00639
Toyja E. Kelley, Fed. Bar No. 26949
100 East Pratt Street
Baltimore, MD 21202
Telephone: (410) 752-9700
Facsimile: (410) 727-5460
E-mail: jisbister@tydingslaw.com
E-mail: tkelley@tydingslaw.com

Frank J. Johnson
**JOHNSON BOTTINI LLP**
501 W. Broadway, Suite 1720
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 238-0622
E-mail: frankb@johnsonbottini.com

*Counsel for Plaintiff*

#1185003v.1